# In the United States Court of Federal Claims

No. 12-151C

(Filed: December 19, 2013)

| | | |
|---|---|---|
| ************************************* | * | |
| | * | |
| JEMAL'S LAZRIV WATER, LLC, | * | |
| | * | |
| Plaintiff, | * | Contract Disputes Act; GSA Leases for |
| | * | Office Space; Tax Adjustment Clause; |
| v. | * | Contract Interpretation; Determination |
| | * | of Base Year and Full Assessment; |
| THE UNITED STATES, | * | Cross-Motions for Summary Judgment. |
| | * | |
| Defendant. | * | |
| | * | |
| ************************************* | * | |

*Lynn Estes Calkins*, Holland & Knight, LLP, Washington, D.C. for Plaintiff.

*Martin M. Tomlinson*, with whom were *Stuart F. Delery*, Assistant Attorney General, *Bryant G. Snee*, Acting Director, and *Franklin E. White, Jr.,* Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. for Defendant.

OPINION AND ORDER

WHEELER, Judge.

This case arises under the Contract Disputes Act, 41 U.S.C. § 7104 and the Tucker Act, 28 U.S.C. §§ 1491(a)(1) and (2), and stems from different interpretations of a clause contained in five leases for space in an office building in Washington, D.C. Each of the five leases between Plaintiff Jemal's Lazriv Water, LLC ("Jemal's") and the General Services Administration ("GSA") includes a tax adjustment clause which states that the Government shall make a payment to Jemal's for its share of any increase in real estate taxes over the amount established as the base year taxes. Jemal's and the Government disagree as to what constitutes "the base year." Each lease defines base year taxes to include "the real estate taxes for the first 12-month period of the lease term coincident with full assessment." Joint Stipulation ("Stip.") ¶¶ 7-8.

At the heart of this dispute is the meaning of the term "full assessment" in the leases. Under Plaintiff's interpretation, a full assessment occurred no later than tax year 2007. According to the Government, the property in question was not fully assessed until tax year 2010,[1] and so GSA's contracting officer denied Plaintiff's claims for payment for the Government's share of the increase in real estate taxes during the 2008, 2009, and 2010 tax years. Jemal's argues that the Government is contractually obligated to reimburse Plaintiff for the Government's share of the tax increase during these years. On March 30, 2013, Jemal's filed its complaint in this Court to recover the $2,240,884.74 plus interest it claims it is entitled to under the five leases. The matter comes before the Court on cross-motions for summary judgment. The Court heard oral argument on December 4, 2013.

Factual Background

Between 2004 and 2008, GSA entered into five leases with Jemal's for office space located at 1900 Half Street, S.W., Washington, DC 20024 ("the Property"). Stip. ¶ 3. GSA accepted space under two of the leases in 2005, and accepted space under the other three leases in 2006, 2007, and 2008. Id. In addition to rent, GSA was obligated to pay tax adjustments as provided in the solicitation, which was incorporated into the leases. Under the tax adjustment clause, the United States "shall 1) make a single annual lump sum payment to the Lessor for its share of any increase in real estate taxes during the lease term over the amount established as the base year taxes or 2) receive a rental credit or lump sum payment for its share of any decreases in real estate taxes during the lease term below the amount established as the base year taxes." Stip. ¶ 5.

The leases define the base year taxes as "the real estate taxes for the first 12-month period coincident with full assessment."[2] Stip. ¶¶ 7-8. According to the definition contained in the leases, the full assessment means that "the taxing jurisdiction has

---

[1] In the District of Columbia, the assessed value for all real property is the estimated market value of such property on the valuation date. This assessment is used to calculate taxes for the following tax year. For instance, if a property was assessed on January 1, 2009, this assessment would be used to calculate taxes for the 2010 tax year which began on October 1, 2009 and ended September 30, 2010.

[2] In four of the five leases, the base year taxes are defined as "1) the real estate taxes for the first 12-month period coincident with full assessment or 2) may be an amount negotiated by the parties that reflects an agreed upon base for a fully assessed value of the property." Stip. ¶ 7. Neither party argues that the parties negotiated an agreed upon base for purposes of the tax adjustment clause, and so the Court limits its attention to the first part of the definition. For purposes of the fifth lease, the base year taxes are solely defined as "the real estate taxes for the first 12-month period of the lease term coincident with full assessment." Stip. ¶ 8.

2

considered all contemplated improvements to the assessed property in the valuation of the same. Partial assessments for newly constructed projects or for projects under construction, conversion, or renovation will not be used for establishing the Government's base year for taxes." Stip. ¶ 10. The taxing jurisdiction for the Property is the District of Columbia's Office of Tax and Revenue ("OTR"). Stip. ¶ 26.

An OTR representative testified in a deposition that the D.C. Code obligates OTR to base its assessments on 100 percent of the market value of the property being assessed. Stip. ¶ 31. When appraising the Property, OTR used what is called the "income approach" to determine the market value. Stip. ¶ 33. The income approach is most often used when appraising a property owned for its ability to produce income to the owner. Under this approach, OTR estimates the property's potential net operating income, to which it applies a capitalization rate[3] for the class of property at issue to derive the stabilized value[4] of the property. Id. OTR then calculates the present value of lease-up costs, which is an estimated value of lost rent and the necessary tenant improvements required to lease vacant space or renew space. Stip. ¶ 39. Once calculated, the lease-up costs are subtracted from the stabilized value of the property to arrive at the assessed market value of the property. Stip. ¶ 40. The table below depicts the information provided by the parties about the building's vacant space, the lease-up costs, OTR's assessment of the value of the Property, and the annual real estate taxes during 2007-2010.

| Tax year[5] | Square feet of rentable office space available in the previous year | Lease-up costs | OTR's assessment of the value of the Property | Annual real estate taxes |
|---|---|---|---|---|
| 2007 | 471,736 | $18,086,828 | $35,668,065 | $659,859.20 |
| 2008 | 317,672 | $14,762,448 | $51,213,028 | $947,441.02 |
| 2009 | 130,336 | $8,922,880 | $95,303,032 | $1,757,106.08 |
| 2010 | 89,948 | Not provided | $121,780,000 | $2,246,930.00 |

---

[3] The capitalization rate is the rate of return on a real estate investment property based on the expected income that the property will generate. The rate is calculated by dividing the income the property will generate (after fixed costs and variable costs) by the total value of the property.

[4] Stabilized value is the value of a property after it reaches a normal occupancy rate and operating expenses.

[5] The District of Columbia tax year runs from October 1 to September 30.

3

No tenant improvements had been performed on any of the office space in the Property at the time GSA initially contacted Plaintiff regarding leasing a portion of the Property. Stip. ¶ 41. Tenant improvements were made to the Property on a lease-by-lease basis as GSA accepted the premises. Stip. ¶ 41-43. Plaintiff reported spending $12,841,041 on capital improvements to the Property in 2007 and $5,528,346 on capital improvements in 2008. Stip. ¶¶ 51-52. The final tenant improvements to the property were not completed until shortly before GSA accepted the fifth and final space in September 2008. Stip. ¶¶ 3, 43.

The assessed value of the property increased by $86,111,935 between tax year 2007 and tax year 2010. Stip. ¶¶ 68-71. Pursuant to the terms of each of the five leases, Jemal's submitted tax documents to GSA seeking reimbursement for the Government's share of the increase in real estate taxes. Stip. ¶ 11. On January 26, 2012, GSA denied Plaintiff's certified claims submitted under the Contract Disputes Act.[6]

## Analysis

A. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a) of the Rules of the Court of Federal Claims. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment will not be granted if the "evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

In reviewing a motion for summary judgment, the Court views the factual record and the inferences to be drawn from the record in the light most favorable to the non-moving party. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When cross-motions for summary judgment are presented, the Court evaluates each motion on its own merits and draws reasonable inferences against the party whose motion is under consideration. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). The Court will deny both motions if a genuine issue of material fact exists. Id. Here, both Jemal's and the Government agree that there are no disputed issues of material fact. This case presents an issue of contract interpretation, and as a question

---

[6] On January 26, 2012, GSA issued formal denials on four of the five certified claims. GSA did not issue a formal denial on the final claim within 60 days of Plaintiff's submission. Because the CO did not reach a final decision within 60 days of that date, the claim is deemed denied. Stip. ¶¶ 16-17.

4

of law, may be decided on motions for summary judgment. Blackstone Consulting Inc. v. United States, 65 Fed. Cl. 463, 468 (2005).

In questions of contract interpretation, the inquiry begins "with the language of the written agreement." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004). The Court must construe a contract so as to "effectuate its spirit and purpose," Northrop Grumman Corp. v. Goldin, 136 F.3d 1479, 1483 (Fed. Cir. 1998) (quoting Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)), and a contract must be considered as a whole and interpreted in such a manner to harmonize and give reasonable meaning to all of its parts. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996). A contract clause is construed in order to give it the effect intended by both parties. Honeywell, Inc. v. United States, 661 F.2d 182, 186 (Cl. Ct. 1981).

### B. The Plaintiff's Interpretation of the Full Assessment Term is not Reasonable.

The meaning of the full assessment term in the five leases is the legal question at the heart of the dispute before the Court. The threshold question is whether this term contains ambiguous language or supports only one reading. NVT Techs., 370 F.3d at 1159. The Court begins this inquiry by examining the plain language of the contract and determining if it can reasonably be interpreted in more than one way. LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir. 2009).

As expressly defined by the terms in the lease, a full assessment has occurred when the taxing jurisdiction has "considered all contemplated improvements to the assessed property in the valuation of the same." Stip. ¶¶ 10. Both parties assert that the term is unambiguous. The Government takes the position that "full assessment" requires OTR to consider all improvements contemplated in the lease once the improvements are completed.[7] According to the Plaintiff's interpretation, OTR has considered the contemplated improvements if OTR acknowledges that there are contemplated improvements to the property which have yet to be completed. Under Plaintiff's interpretation, a full assessment occurred no later than tax year 2007. In essence, the dispute boils down to different readings of the phrase "considered all contemplated improvements" and whether the OTR can consider improvements before the improvements have been completed.

---

[7] GSA states that the contemplated improvements were not completed until September 2008. Such improvements would have been considered in the assessment when OTR determined the estimated market value of such property on the valuation date in January 2009. This assessment would have been used to calculate taxes for tax year 2010.

To show an ambiguity, it is not enough that the parties differ in their respective interpretations of a contract term. Rather, both interpretations must fall within a zone of reasonableness. Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 751 (Fed. Cir. 1999). It is a fundamental tenet of contract construction that a contract should be interpreted so as not to render portions of it meaningless. Medlin Constr. Grp. v. Harvey, 449 F.3d 1195, 1201 (Fed. Cir. 2006). Here, Plaintiff's interpretation of the full assessment term renders the term meaningless. Any tax assessment by the OTR, according to Plaintiff's definition, will qualify as a full assessment because the OTR always considers the improvements that still need to be made to a property when it calculates lease-up costs. Under such an interpretation, an assessment of an empty shell of a building with no tenants would meet the definition of full assessment. If the parties intended the base year to be any year before improvements had been made there would have been no need to add the full assessment term. Plaintiff's interpretation of full assessment is unreasonable because it renders the term meaningless. See Medlin, 449 F.3d at 1201 (finding the government's interpretation of a provision unreasonable because it would render portions of the contract meaningless). Thus, the full assessment term is unambiguous because only the Government's interpretation of the term is reasonable.

    C. The Government's Interpretation Comports with the Intent and Purpose of the Full Assessment Term.

The ultimate aim of contract interpretation is to arrive at a definition that most clearly reflects the original intentions of the parties. Alliant Techsystems Inc. v. United States, 74 Fed. Cl. 566, 576 (2007). The intent of the parties is determined by a review of the contract, and if necessary, other objective evidence. Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005). Thus, the Court analyzes the parties' intentions regarding the full assessment term based upon the language of the lease and secondary sources on the use of tax escalation clauses.

Plaintiff has submitted a declaration from the former Chief Assessor of OTR, David Fitzgibbon, which states that as part of its assessment methodology, OTR considers all improvements required for the use of the assessed property. Such a fact is far from dispositive. The full assessment term is a contractual term used by the parties, and is not automatically dependent upon the labels used by the taxing jurisdiction to describe its assessment methodology. Rather, the Court must construe the term in a manner that gives effect to the parties' intentions. Here, the parties included the following sentence after the express definition of full assessment: "Partial assessments for newly constructed projects or for projects under construction, conversion, or renovation will not be used for establishing the Government's base year for taxes." Stip. ¶ 10. The inclusion of this sentence strongly suggests a recognition by the parties that

partial assessments were inappropriate for determining the base year because partial assessments would render the base period arbitrarily low and make the lessee liable for a sudden rise in taxes.

Indeed, a review of secondary sources on tax escalation clauses reinforces the Government's position that the full assessment term requires OTR to consider all improvements contemplated in the lease once the improvements are completed. Tax escalation clauses are regularly used in leases to share risks between the lessor and lessee. If taxes rise during the term of the lease, the lessor can pass on increases in real estate property taxes to the lessee in proportion to the space occupied by the lessee. Kimbrell v. Fischer, 15 F.3d 175, 176-77 (Fed. Cir. 1994). On the other hand, if taxes fall during the term of the lease, the lessee can share in the tax savings. However, tax escalation clauses contain a widely recognized trap for a lessee. If a lessee enters a lease while the property is undergoing major improvements, the taxing authority will consider the improvements that still need to be made to the property and subtract them from the stabilized value of the property to arrive at the assessed market value. This renders the base period artificially low and exposes the lessee to the risk of significant tax escalation as the improvements are completed. See, e.g., William F. Treanor, Challenges to Rent Escalation Clauses in Commercial Leases, Prob. & Prop., May/June 1990, at 6-7. For this reason, sophisticated tenants like the GSA, when negotiating with sophisticated lessors like Jemal's, often insist on the inclusion of a term explicitly stating that the tax escalation clause shall not apply until the leased premises have been assessed by the taxing authority as fully improved. Otherwise, the increases in taxes will not reflect normal tax increases but rather the gradual completion of improvements to the building. See, e.g., 2 Real Estate Leasing Practice Manual § 48:17. Thus, Plaintiff's interpretation frustrates both the intent and purpose of the term. Conversely, the Government's interpretation gives meaning to the term in light of the parties' intent at the time they entered into the agreement.

> D. Precedent for the Government's Interpretation is Found in Opinions from this Court and Administrative Boards.

Not only does the Government's interpretation comport with the plain language of the lease term and with common sense, but the Government's interpretation also is consistent with the way other courts have interpreted similar terms. For instance, in Appeal of Otto K. Wetzel Landmark Ctr., the General Services Board of Contract Appeals ("GSBCA") recognized that the full assessment term protected GSA from having to pay for significant tax increases that were the result of improvements to other tenant spaces. GSBCA No. 7466, 85-2 B.C.A. (CCH) ¶ 18099 (Apr. 30, 1985). The GSBCA defined "full assessment" as the completion of "all improvements contemplated

by the lessor to the assessed property," and explained that "this tax escalation clause is not to be interpreted to hold respondent responsible for tax increases resulting from improvements to other tenant spaces in the Center." Id. at *3.  Likewise, in Kimbrell v. Fischer, the Federal Circuit adopted the GSBCA's analysis and reasoning in Wetzel, and found that full tax assessment meant assessment after all improvements contemplated in the lease were made.  15 F.3d at 177.

Jemal's notes that the present case can be distinguished from Kimbrell and Wetzel because the leases at issue in those cases did not contain an express definition of full assessment, while the term is defined in the lease between Jemal's and the GSA. However, this is a distinction without a difference.  The GSBCA's underlying reasoning in Wetzel applies here—the Government should not have to pay for tax increases resulting from improvements to other tenant spaces in the Property.

Furthermore, support for GSA's interpretation that "full assessment" can only occur after contemplated improvements have been completed is found in a recent case from this Court involving an identical term.  Like the present case before the Court, the parties in Alpena Marc, LLC v. United States disagreed over what constituted the base year for purposes of the tax escalation clause.  108 Fed. Cl. 200 (2012).  The lease in Alpena Marc contained a tax adjustment clause in ¶ 3.4 with the exact same definition of "full assessment" that is in the lease between GSA and Jemal's.  The dispute over the base year in Alpena Marc stemmed from the fact that there was a patent ambiguity between the terms in ¶ 3.4 and a separate term in the lease that said 2005 was the base year.

While the issue in Alpena Marc differs from what is before the Court now, it is significant that Judge Christine O.C. Miller interpreted the phrase "considered all contemplated improvements" to mean considered all completed improvements. The property at issue in Alpena Marc required substantial renovations before it would meet the Government's requirements.  In analyzing the two conflicting terms, Judge Miller wrote, "the court agrees with defendant that ¶ 3.4.B. defines 'base year taxes' as the real estate taxes for the twelve-month period that corresponds to the first full assessment of *the renovated property*."  Id. at 206 (emphasis added).  Judge Miller's use of the phrase "renovated property" suggests that full assessment has occurred after the contemplated improvements have been completed.  Applying that reasoning to the case before the Court, the base year would be 2010.

E. <ins>Full Assessment did not Occur until Tax Year 2010 after the Improvements Contemplated in the Lease were Completed.</ins>

Finding 2007 as the base year would penalize the Government for being the first tenant to accept space in a vacant building in need of improvements.  This result was certainly not the parties' intention when they included the tax adjustment clause in the leases.  On the contrary, the primary purpose of the full assessment term was to ensure that the Government was not responsible for paying tax increases due to tenant improvements to other tenant spaces.  Here, the assessed value of the property increased 241 percent between tax year 2007 and tax year 2010.  It is possible that the property rose in value, in part, due to external conditions in the market place—such as the fact that the Property is located in close proximity to the newly constructed Nationals Baseball Park in Washington, D.C.  However, it is also true that the Property experienced a jump in value because OTR's 2007 assessment was of a completely vacant building in need of significant improvements to attract tenants.  Not surprisingly, such improvements increased both the value of the building and the taxes assessed by OTR.  This type of tax increase is precisely what the full assessment term is designed to prevent as a charge to the lessee.

Accordingly, the Court finds that the first tax year for which OTR could have possibly considered the completed improvements in its valuation of the property was tax year 2010, which ran from October 1, 2009 through September 30, 2010.  It was then that OTR was able, for the first time, to fully incorporate into its valuation of the property the fact that all of the contemplated improvements had been completed.

Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED and the Government's cross-motion for summary judgment is GRANTED.  The Clerk of the Court shall enter final judgment for the United States.  No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler<br>THOMAS C. WHEELER<br>Judge